**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 23-CR-78-JPS |
| JACK DALY, | |
| Defendant. | |

**DEFENDANT JACK DALY'S SENTENCING MEMORANDUM AND**
**INCORPORATED MOTION FOR A DOWNWARD VARIANCE**

Defendant Jack Daly, by counsel, submits this sentencing memorandum and incorporated motion for a downward variance. Mr. Daly respectfully submits that a sentence of 24 months' probation, followed by three years of supervised release, would be sufficient, but not greater than necessary, to achieve the statutory purposes of sentencing as set forth in Section 3553.

This Court should determine that the applicable advisory sentencing guidelines range is 6 to 12 months, based upon an Offense Level Total of 10 and a Criminal History Category of I.[1] PSR ¶¶ 156–65. The small variance to the requested sentence set forth above is appropriate for a number of reasons, including the nature and circumstances of the offense, Mr. Daly's positive personal conduct and patriotic service for the vast majority of his life, as well as his acceptance of responsibility, including his early efforts to provide complete restitution to victims and the significant, sincere rehabilitative efforts he has undertaken. In addition, this case is far afield (and

---

[1] For the reasons articulated in Mr. Daly's brief regarding the guidelines calculation, ECF No. 16, Mr. Daly respectfully requests the Court reach the same conclusion as the U.S. Probation Department and find the guidelines range is 6 to 12 months based on an Offense Level of 10 and a Criminal History Category of I. If the Court determines Mr. Daly's Offense Level is higher, resulting in a higher advisory sentencing guidelines range, Mr. Daly respectfully submits the Court should depart downward and grant a variance to the sentence Mr. Daly requests here. A higher Offense Level would "substantially overstate[] the seriousness of [Mr. Daly's] offense," thus warranting the downward departure. U.S.S.G. § 2B1.1, n.21(c); *see also* ECF No. 16 at 21–22.

far less egregious) from typical fraud cases and, in particular, other political fundraising cases that the Government has charged historically. Importantly, using the Offense Level articulated in the Presentence Investigation Report ("PSR"), the guidelines advise that "a sentence other than a sentence of imprisonment . . . is generally appropriate." U.S.S.G. § 5C1.1 application note 10(A).

## STATUTORY SENTENCING FRAMEWORK

In imposing a sentence, this Court must first correctly calculate the applicable guidelines range. Though "the Guidelines should be the starting point and the initial benchmark," the Court "must then consider the arguments of the parties and the factors set forth in § 3553(a)." *United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018) (internal quotation marks omitted) (alterations omitted) (quoting *Peugh v. United States*, 569 U.S. 530, 536 (2013)).

"When determining a sentence, the court 'must make an individualized assessment based on the facts presented. If [it] decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Id.* (alterations in original) (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)).

## APPLICATION OF SENTENCING FACTORS

Each Section 3553 factor supports Mr. Daly's requested, non-custodial sentence.

### A. The Nature and Circumstances of the Offense.

Mr. Daly (Jack) is before the Court because of his role in connection with the Sheriff David Clarke for U.S. Senate (Official Draft Campaign) political action committee (the "Draft PAC"). *See generally* ECF No. 2 at pp. 16–18. When viewed in context, the nature and circumstances of Jack's offense strongly support a non-custodial sentence. The criminal conduct at issue was limited in nature—the vast majority of Jack's conduct in connection with the Draft PAC was

consistent with a bona fide draft effort, in pursuit of a sincerely held political desire. Moreover, Jack's operation of the Draft PAC played an insignificant role in his subsequent business success.

There is a clear demarcation date between criminal and non-criminal conduct in this case: July 22, 2017, the date upon which the conspiracy charged in the Criminal Information began. ECF No. 1 ¶ 3. The discrete post-July 22 conduct to which Jack pled guilty includes: (i) participating in the deployment of two solicitations that, notwithstanding public comments to the contrary by Clarke, painted a false picture of Clarke's willingness to run for Senate; and (ii) falsely listing another individual as the Draft PAC's new treasurer in filings with the Federal Election Commission ("FEC") when, in fact, that individual agreed to serve as treasurer in name only and Jack continued to largely perform the duties of treasurer. *Id.* ¶¶ 3–4. Jack fully accepts responsibility for this conduct. But the Court should reject the Government's attempt to make this case more than it is.

### 1. *The Draft PAC's focus on fundraising and identifying potential donors was not illegitimate, unusual, or nefarious.*

The Government has repeatedly tried to portray the entire Draft PAC as a "scam" or as an attempt by Jack to enrich himself. This is simply wrong. To see why, it is critical to understand the nature of a draft PAC. At its core, the primary purpose of a draft PAC is to convince a potential candidate to run for political office. Supp. Decl. of Kevin Seifert ¶ 5, attached hereto as Exhibit B1 (hereinafter, "Seifert Supp. Decl."). To do so, draft PACs undertake critical groundwork that creates a foundation for a would-be candidate to be successful if he or she ultimately decides to run for political office. A key component of a draft PAC, and perhaps the most important, is identifying proven supporters of the would-be candidate through building a list of such supporters, known as a "house file." *See id.* ¶ 5, 15; PSR ¶ 87. In the draft context, a large house file (i) demonstrates to the would-be candidate that he or she would have the necessary support (financial

and otherwise) to mount a competitive campaign, and (ii) if the would-be candidate decides to run, provides a ready-made house file the campaign can purchase or rent to jumpstart its fundraising program. *See* Seifert Supp. Decl., Ex. B1 ¶¶ 11, 15; PSR ¶ 87.[2]

Kevin Seifert, a political fundraising expert, describes in his supplemental declaration the legitimate and central value and importance of a draft PAC building a house file, as well as the process and great expense associated with it. Seifert Supp. Decl., Ex. B1 ¶¶ 11, 13, 17. Preparing and deploying solicitations can cost significant sums, requiring draft PACs to expend resources before ever receiving donations. *Id.* ¶ 17. It is by no means unprecedented for a draft PAC to reinvest a significant percentage—even most—of donations received to fund additional solicitations and fundraising. *Id.* ¶ 17, 19–20. Moreover, draft PACs are subject to FEC limitations on contributions to federal candidates,[3] reinforcing the need for a draft PAC to use resources to identify supporters.

There are countless examples of draft PACs, but one recent example is notable and instructive, as it served as a model for the Draft PAC. The National Draft Ben Carson for President Committee (the "Carson Draft PAC") sought (successfully) to draft Dr. Ben Carson to run for President in the 2016 cycle. PSR ¶ 89. The Carson Draft PAC expended significant sums on fundraising and identifying supporters. *Id.* As explained in the declaration of Emily Hoover, who conducted a thorough audit of the Carson Draft PAC's disbursements listed in its FEC reports, the Carson Draft PAC spent approximately **64.21%** of disbursements on solicitation and fundraising expenses. Decl. of Emily Hoover ¶ 25, attached hereto as Exhibit B2 ("Hoover Decl."); *cf.* Hoover

---

[2] An index of exhibits cited herein is attached hereto as Appendix A.
[3] 11 C.F.R. § 110.1(b)(1). Clarke himself was aware of this limitation of the Draft PAC. In March 2017, Clarke forwarded a Draft PAC email solicitation to Vicki McKenna, a Wisconsin radio host (indeed, the host of the program on which Clarke denounced a run for Senate). In response, McKenna asked, "and I assume that ZERO of this is making its way to your campaign account?" Clarke responded, "[i]t can't by law."

Decl. ¶ 26 (demonstrating a draft PAC seeking to convince Senator Ted Cruz to run for president in 2016 spent **83.09%** of disbursements on solicitation and fundraising expenses). These expenses were the result of prolific prospecting necessary to compile an enormous house file, which Carson's eventual campaign rented to solicit donations. PSR ¶ 89. Carson went on to be a competitive candidate and, ultimately, the Secretary of Housing and Urban Development. *Id.*

As detailed below, the vast majority of Jack's efforts in pursuing the Draft PAC were entirely consistent with a lawful and typical draft PAC effort. Jack sincerely wanted to persuade Clarke to run for U.S. Senate, but Clarke himself expressed doubts that he could raise sufficient funds to do so, having spent his entire career in government service. Jack's strategy of expending substantial sums on fundraising was entirely appropriate and consistent with both the primary purpose of draft PACs generally and expenditure decisions made by other legitimate draft PACs in the past. While Jack readily accepts responsibility for the conduct to which he pleaded guilty (sending out two solicitations that painted an inaccurate picture of Clarke's willingness to run and falsely listing the Draft PAC treasurer in FEC filings), it is simply not true that the Draft PAC was somehow illegitimate or operated for an improper purpose for the duration of its existence.

> **2.  The Draft PAC was legitimate and bona fide, and through it, Jack sought, in good faith, up to the inception of the charged conspiracy in late July 2017, to further his genuine desire for Clarke to run for Senate.**

Jack has lived and breathed politics from a very young age and pursued that passion throughout his life. *See* PSR ¶¶ 99, 139, 178. Indeed, for Jack, politics is more than a passion. We now know that his hyperfocus on politics is a symptom of his long undiagnosed Autism Spectrum Disorder ("ASD"). *See* Psychological Evaluation from Dr. Lynda Geller at 1, 23, attached hereto as Exhibit C2.

With respect to Clarke, Jack began efforts to encourage him to run for Senate long before he formed the Draft PAC. PSR ¶ 95. Jack first met Clarke around February 2015 and, during a

one-on-one conversation, encouraged him to switch from the Democratic to the Republican Party and challenge Senator Tammy Baldwin for U.S. Senate. *Id.* Jack reiterated this message during another conversation with Clarke around November 2015, as did Jack's co-defendant Nathanael Pendley when he met Clarke around October 2016. PSR ¶ 96. Around that time, Jack began to formalize his efforts to convince Clarke to run for Senate. PSR ¶ 97.

Jack registered the Draft PAC with the FEC in January 2017 with the stated (and indisputably legitimate) purpose of drafting Clarke to run for Senate. PSR ¶¶ 98, 101. At that time, Jack's digital marketing business (Reach Right, LLC) already possessed significant donor data consisting of over one million email addresses. *See* Seifert Supp. Decl., Ex. B1 ¶ 28.

Over the next several months before July 22, 2017, Jack invested immeasurable time, energy, and resources in the Draft PAC in good faith. *See* PSR ¶¶ 99, 101. Jack contributed his large and valuable donor data to the Draft PAC at no cost. *See* PSR ¶ 99. While Jack could have charged significant sums for the Draft PAC's access to and serial use of his donor data, he did not, instead treating it as an in-kind donation. *See id.* Nor did Jack cause the Draft PAC to pay him customary agency fees and/or broker fees for the Draft PAC's rentals of other lists. *See id.* Using his data, Jack deployed numerous solicitations (which were copywritten by Pendley) on behalf of the Draft PAC, often covering the associated costs out of his own pocket. *See* PSR ¶¶ 83, 85, 99. Jack also worked with Pendley to set up a direct mail fundraising program for the Draft PAC with Eberle Associates, a well-known conservative direct mail fundraising firm. *See* PSR ¶ 113.

In addition, Jack undertook non-fundraising activities aimed at driving engagement for the Draft PAC, including creating and purchasing custom bobbleheads of Clarke, hosting a reception at the 2017 Conservative Political Action Conference (which Clarke attended and addressed supporters), purchasing (at Clarke's request) billboard advertising in Milwaukee County, and

- 6 -

creating and publishing digital advertising on conservative websites and on social media. PSR ¶ 101. Lastly, Jack commissioned a poll regarding Clarke's viability as a candidate for Senate. *Id.*

Importantly—and indicative of Jack's genuine intent to administer the Draft PAC in a proper manner—Jack engaged Clarke directly to explain his efforts and goals for the Draft PAC. PSR ¶ 104. In February 2017, Jack emailed Clarke through a surrogate to, *inter alia*, offer to meet with Clarke to allow Clarke to ask questions about the Draft PAC's "activities and intentions" and "achieve a comfort level with [the Draft PAC's] intentions." *Id.* Jack stated: "The bottom line is that we wish to open up a channel of communication so that you are not left in the dark, steaming with skepticism or suspicion about who we are and what we plan to do." *Id.* Clarke accepted Jack's invitation and met with Jack and Pendley in Washington, D.C. on February 23, 2017. *Id.* Among other topics, Jack discussed the results of the Draft PAC's poll with Clarke. *Id.*

Upon learning about the Draft PAC, Clarke expressed support for the Draft PAC. *See* PSR ¶¶ 104, 106, 108. For example, in late January 2017, shortly after the Draft PAC deployed its first email solicitation, Clarke received an email from a supporter, which referenced a solicitation and offered support for a potential campaign. Ex. A1. Clarke instructed a surrogate to contact the supporter because "[t]here is political capital in this draft movement. People all over the country are asking me about it. I am being non commital [sic]." *Id.* In February 2017, Clarke noted, after Bob Dohnal, the publisher of Wisconsin Conservative Digest, forwarded Clarke a Draft PAC solicitation, that the "other" PACs raising money purportedly to draft him to run for Senate were "Sca[m]PACS" (indicating Clarke did ***not*** believe Jack's Draft PAC was a scam PAC). Ex. A2. In March 2017, Clarke emailed Jack talking points for a response to a political reporter for the Milwaukee Journal Sentinel, Daniel Bice. Ex. A3. Clarke said:

> F*** Bice. Tell him that Clarke's nationwide appeal has been great for fundraising (DO NOT GIVE HIM FUNDRAISING

NUMBERS). Clarke is Baldwin['s] worst nightmare and she knows it. It's why all the local Dem pols are attacking him. A local urban radio talk radio host recently told Clarke that blacks will not come out for Baldwin because she is not emotionally connected to the hood. They do not know who she is. She doesn't share their experiences like Clarke does. Vets love Clarke, cops love him, blacks love him, whites love him, women feel safe about him, Hispanics love him, gun owners love him. Like with Trump, pollsters will never capture these demographics and even if they did, they wouldn't tell them they'll vote for Clarke. Baldwin is a back bencher, unaccomplished do nothing fist [sic] term politician. She is an elitist who only cares about global warming and bathroom issues. Those aren't Wisconsin's values.

*Id.* (unredacted expletive in original). And in approximately March 2017, on a phone call with Jack, Clarke told Jack the Draft PAC had his "tacit approval." *See* PSR ¶ 109.

While Clarke privately told some confidants other than Jack that he was not seriously considering a run for Senate, Clarke intentionally fueled speculation regarding a potential run, and his public statements left the door decidedly open to running.[4] From the very beginning of the Draft PAC's existence, Clarke instructed surrogates to "keep the speculation alive," *id.*, and to be "coy" about his intentions.[5] Accordingly, Clarke and his representatives made statements during 2017 that could reasonably lead one to believe Clarke was, at a minimum, not opposed to the idea of running for Senate and, more realistically, actively considering such a run. *See* PSR ¶ 106. Indeed, Senator Baldwin seems to have believed Clarke may run, as her campaign solicited donations on the prospect of a potential Clarke candidacy. PSR ¶ 107.

In seeking to portray the entire Draft PAC as fraudulent, the Government has pointed to

---

[4] *See, e.g.*, Ex. A4 (in response to a question regarding whether he is "seriously considering a senate run," Clarke stated "Between you and me? No. Want [t]o keep libs, media and Dems guessing however.").

[5] Ex. A5 (Clarke forwards an AP reporter's email to a surrogate and instructs the surrogate to "be coy. Something like ...Sheriff's future plans are still fluid. Running for re-election as Sheriff is at the top of his list."). *See also* Exs. A6 (in response to an email regarding a caucus for potential U.S. Senate candidate, Clarke instructs a surrogate to say "[s]omething to the effect that it is counterintuitive for me to participate in something when no decision has been made on my part about running."), A7 (in response to a solicitation from the Draft PAC, Clarke says "We can have some fun with this is one. Don't dig me in too deep tho [sic]. Trying to keep lefties guessing in Wisconsin.").

statements in pre-July 21, 2017, solicitations that describe TV and radio ads. PSR ¶¶ 24–31. These solicitations are not relevant for sentencing, given the parties' carefully negotiated plea agreement that pins the offense conduct as starting after July 21, 2017. In any event, these statements were generally accurate, as the Draft PAC was making genuine efforts to develop radio and television advertisements in the spring of 2017. PSR ¶ 102. It is not uncommon for fundraising appeals— by political campaigns and by charitable organizations—to highlight only more tangible uses of donations and not to detail administrative and fundraising expenses. As Kevin Seifert notes, "[t]ypically a draft PAC's solicitations will not specify precisely how the draft PAC will use each portion of donations it receives. To the extent specific expenditures are referenced within solicitations, they are often merely examples of ways a draft PAC may choose to allocate funds." Seifert Supp. Decl., Ex. B1 ¶ 12. Further, in the lifecycle of a draft PAC, it is common for expenditures first to focus on building a base of donors so that funds are available later for expenditures like radio and TV ads. Jack acknowledges that a May 26, 2017, solicitation incorrectly stated that radio ads "were just aired," when radio ads had not aired. PSR ¶ 25. Jack did not write that solicitation, however, and he has subsequently learned that this error resulted from the copy having been written before the Draft PAC finally decided whether to proceed with radio advertisements. Thus, the statements about TV and radio advertising are no basis to view the Draft PAC as a "scam." There is certainly no basis to conclude that this error (made by others) was designed to mislead.

### 3. Jack's participation in the deployment of the two solicitations at issue, when viewed in context, demonstrates the limited scope of criminal conduct in this case.

The conduct at issue here followed a public remark by Clarke on July 21, 2017, during a radio interview with a conservative local radio talk show host, in which Clarke stated that he did not intend to run for Senate. PSR ¶ 109. During the same radio interview, Clarke (without basis

and contrary to his previous statements) called the Draft PAC a "scam PAC" and instructed potential donors to "hang onto your money."[6] These comments came as a complete surprise to Jack, who had been in contact with Clarke and his surrogates throughout 2017—none of whom expressed displeasure with the Draft PAC. Prior to this date, Jack did not have any conversations with Clarke, or anyone associated with him, regarding ceasing the draft effort, nor did Jack have any indication Clarke was displeased with the campaign. Indeed, as discussed below, it was not until September 2, 2017, that Clarke asked Jack for the first time directly to cease the Draft PAC's fundraising activity, a request with which Jack complied. PSR ¶ 124.

Notwithstanding Clarke's public rebuke of the Draft PAC, it was entirely lawful for the Draft PAC to continue its efforts to draft Clarke to run for Senate (as it would have been even in light of Clarke's email to Daly directing him to cease). Draft PACs have operated, and continued to solicit funds from donors, in the face of unequivocal denunciations from the potential candidates themselves with respect to the PAC's efforts. By way of just one example, the Ready for Warren PAC, a draft PAC whose purpose was to draft Senator Elizabeth Warren to run for President in 2016, continued its draft efforts notwithstanding consistent public statements by Senator Warren that she was not running for President and a public disavowal of the PAC.[7]

Jack's conduct became unlawful as the result of poor decisions he made in the context of the two solicitations deployed by the Draft PAC (*i.e.*, the August 2, 2017, direct mail solicitation and the September 2, 2017, digital solicitation). More specifically, the unlawful conduct was Jack's choosing to send solicitations that did not reference Clarke's public statement regarding not running. Jack's failure to cause those solicitations to be edited or rewritten created an impression

---

[6] Radio Interview of David Clarke (July 21, 2023), *available at* https://podcasts.apple.com/us/podcast/ vicki-mckenna-on-wisn/id1253599002?i=1000390172122.
[7] Jake Miller, *Sen. Elizabeth Warren Disavows 2016 Presidential Draft Effort*, CBS NEWS (Aug. 23, 2014), https://www.cbsnews.com/amp/news/sen-elizabeth-warren-disavows-2016-presidential-draft-effort/.

that Clarke was still considering, or at least open to, a Senate run.

With respect to the August 2 solicitation, the mailer was a relic of copy Pendley drafted well before Clarke's radio interview. Indeed, Pendley, in coordination with Eberle, previously drafted and approved the copy and artwork. PSR ¶ 113. The solicitation was appropriate at the time Pendley drafted it and not inconsistent with the image Clarke was curating in the public regarding his openness to run for Senate. *See id.*[8] As the mailer pre-dated Clarke's radio interview, it did not contain any reference to Clarke's statement regarding his intention not to run for Senate. Instead, the solicitation stated Clarke "will run" for Senate, which reflected their optimistic hope at the time the mailer was written. By the time of Clarke's radio interview, Eberle had already printed the mailers, and the Draft PAC had incurred approximately $6,000 in costs in connection with the mailer. PSR ¶ 113. In an ill-considered attempt to recoup the cost of the mailer on behalf of the Draft PAC, Jack and Pendley approved its deployment. *Id.* Jack readily acknowledges that decision was wrong, and that Clarke's representation that he did not intend to run for Senate rendered the August 2 mailer misleading. *Id.* Accordingly, it should not have been deployed. *Id.*

The same is true as to the September 2 digital solicitation. Although it made clear Clarke still needed to be drafted, Jack acknowledges that omitting Clarke's public statement that he was not running created an impression Clarke would ultimately announce a Senate run. PSR ¶ 114. For important context, Jack deployed the September 2 solicitation just days after Clarke announced his resignation as Sheriff, reversing his recent prior statements that he intended to complete his term in office. PSR ¶ 118. Clarke's resignation announcement also teased an upcoming announcement about his future plans. PSR ¶ 115. This led some, including Jack and Pendley (as

---

[8] The solicitation also included language that made clear the fact that Clarke still needed to be drafted and was not a declared candidate. *See, e.g.*, Ex. A8 at 2 ("I support Sheriff David Clarke . . . and want him to run for Senate[.]"), 4 ("encourage you to support the campaign to draft Milwaukee Sheriff David Clarke to run for the United States Senate"), 18 ("Petition to Sheriff Clarke Urging him to Run for Senate in 2018!"); *see also* PSR ¶ 113.

corroborated by emails), to believe Clarke might be open to considering a Senate run.  *Id.*  Given the length of time until the May 31, 2018, filing deadline, Jack and Pendley believed there was still ample time to convince Clarke to run for Senate even if he were to take another position in the short term.  *Id.*[9]

#### 4. In an ill-considered effort to avoid the ire of Clarke, Jack listed another individual as the Draft PAC's treasurer.

The second aspect of the offense—misrepresenting the Draft PAC's treasurer—is also limited in scope.  This was not an attempt to evade law enforcement or regulators' attention, or to interfere with the duties of the FEC.  Jack was motivated mainly by avoiding Clarke's ire.  Following the September 2 solicitation, Clarke sent an email to Jack, reiterating that he did not intend to run for Senate and instructing Jack to not "raise anymore [sic] money using [Clarke's] name." Ex. A11; PSR ¶ 124.  This was the first time Clarke asked Jack directly to cease the Draft PAC's efforts, a request with which Jack obliged.  Concerned that Clarke—a high-profile conservative figure with extensive relationships among Republican Party leaders, including then-President Trump—might retaliate against Jack (as Clarke had done to others in the past), Jack elected to falsely tell Clarke that he was no longer involved with the Draft PAC or with the September solicitation.  PSR ¶¶ 125–26.  Jack acknowledges his statements to Clarke were false and, although not a crime unto themselves, regrets responding as he did.  PSR ¶ 126.

In support of his false narrative to Clarke, Jack filed a form with the FEC naming another individual, Z.Z. (whom Pendley had identified) as the PAC's treasurer.  PSR ¶ 127.  Jack acknowledges he was aware this individual would serve as the treasurer in name only, and that he

---

[9] Indeed, following Clarke's resignation, Campaign Inbox (a digital fundraising agency that agreed to take over the Draft PAC's digital fundraising) advised Jack that the resignation represented "a good fundraising opportunity." Ex. A9; PSR ¶ 116.  In other words, the idea for a solicitation following Clarke's resignation originated with Campaign Inbox, not Jack or Pendley.  Campaign Inbox provided a draft solicitation it proposed to deploy.  Ex. A10. Significantly, Campaign Inbox, a reputable and legitimate conservative advertising agency, did not reference Clarke's public statement that he was not running for Senate in the draft solicitation.  *See id.*

- 12 -

listed an effective date on the FEC form that pre-dated the September solicitation. *Id.* Although not the motivation for removing himself as treasurer at that time, the change coincided with Jack's increasing desire to either shut down the Draft PAC or hand it off to others to use for another conservative cause. *See* PSR ¶¶ 110, 126. Jack intended for the "new" treasurer merely to be a placeholder until a suitable treasurer could be located to either handle the Draft PAC's winddown or continue to serve the repurposed entity.

However, following Clarke's hostile email to Jack, the Draft PAC effectively ceased operations. PSR ¶ 128. Other than a name change in January 2018 to eliminate reference to Clarke and gathering information for FEC filings, Jack gave essentially no time to the Draft PAC in the following years and focused on serving the needs of his digital fundraising business's clients. *Id.* He maintained control of the Draft PAC's bank account (which had minimal activity) and facilitated the Draft PAC's filings with the FEC (which likewise showed minimal activity). But this reflected inertia, rather than an ongoing scheme, as Jack found it easier to have routine reports continue to be filed rather than take steps to wind down the Draft PAC. Likewise, by inertia, Jack never followed through on his intention to replace the Draft PAC's placeholder treasurer, Z.Z., resulting in that treasurer continuing to be listed on FEC filings to date.[10] *See id.* Through counsel, Jack is now engaging with the FEC to wind down the Draft PAC.

Jack readily acknowledges that Z.Z. was a nominal treasurer only and, in fact, not the actual treasurer of the Draft PAC, and that listing this individual on FEC forms constituted a false statement to the FEC. But the purpose behind this false statement was an attempt to protect Jack

---

[10] The Government's insinuation that Jack paid Z.Z. $5,000 in November 2022 for nefarious reasons is wrong. The Government did not charge Jack with obstruction or any other offense related to that payment. The payment was for future database work that Z.Z. said he would do. PSR ¶ 129. Jack's comment about not contacting the FEC was related to addressing Z.Z.'s stated sensitivity to anything new bearing his name being published on the FEC website as well as seeking an easier way to wind down the Draft PAC later. PSR ¶ 130. At that time, Jack did not suspect that the Government would investigate (or was investigating) the long-dormant Draft PAC.

and others from Clarke, and not to somehow impact any decision or issue before the FEC. Jack did not want his personal or business reputation to be sullied by Clarke within his political, professional, and personal circles and, as a result, made the regrettable decision to utilize an FEC form to corroborate his deceitful statements to Clarke.

### 5. Jack's business success is not attributable to the Draft PAC, and he obtained minimal personal benefit from the Draft PAC.

Contrary to the Government's suggestion, the Draft PAC's fundraising efforts were not somehow the basis for Jack's commercial success as a digital fundraiser. To be sure, Jack unquestionably achieved incredible commercial success through his private digital fundraising company over the years. But the Government is demonstrably wrong to suggest that Jack's success came because the Draft PAC served to "significantly increase[] the value of [Jack's] 'house list.'" PSR ¶ 21. The Government's claim conflates correlation for causation.

As Kevin Seifert describes, the value of donor data depends largely on (a) the overall size of a list, and (b) its reference performance, meaning how active the list is in the preceding 30 and 90 days. Seifert Supp. Decl., Ex. B1 ¶ 22. Prior to the Draft PAC's inception, Jack's house list already contained over **one million email** addresses, *id.* ¶ 28, a large percentage of whom were proven donors. Jack *donated* the entirety of this list to the Draft PAC for use in its fundraising appeals, without charging customary fees or receiving a percentage of donations received. PSR ¶ 99. The Draft PAC then received donations from 27,480 donors during its *entire* operational existence (17,533 donors via direct mail and 9,947 donors attributable to digital solicitations). Decl. of Kevin Seifert ¶ 64 & Ex. B, ECF No. 17 ("First Seifert Decl."). Given that Jack already had over one million email addresses before the Draft PAC began efforts, most of the Draft PAC's donations were directly attributable to Jack's already-owned data. *See* Seifert Supp. Decl., Ex. B1 ¶¶ 28, 32.

The Draft PAC's activities provided minimal additional value to Jack's data. As Kevin Seifert explains, Jack obtained relatively few additional email addresses through the Draft PAC effort, such that the Draft PAC would not have "meaningfully increased the size, and hence the value, of [Jack's] personal list." Seifert Supp. Decl., Ex. B1 ¶ 34. And the offense conduct itself—two solicitations yielding just 1,547 donations—had "***no impact***" on the size of Jack's list. *Id.* ¶ 35. Moreover, the overall Draft PAC's activities "would have had no more than a transient impact on the" list value because its reference performance—how active the list is—dissipates over time. *Id.*

As Kevin Siefert explains, this analysis applies equally to the baseless argument that Jack used the Draft PAC to refine his list and increase its value, or that Clarke was a uniquely valuable candidate. *Id.* ¶ 39; *see* PSR ¶ 21. After spending years investigating this matter, the government offers no support for that claim beyond one self-interested witness's musings about "purple cows." PSR ¶ 21. The reality is that, by 2017, Clarke "had been a known public figure for over a decade with a common set of political positions," and the Draft PAC's fundraising performance does not "suggest that David Clarke was anything other than ordinary" for fundraising. Siefert Supp. Decl. ¶ 39. Tellingly, the Government has abandoned any effort to forfeit gains to Jack from donor information, despite the plea agreement providing for such forfeiture. *See* PSR at p. 86.

A helpful proxy for assessing the value of the donor data the Draft PAC generated is the rental performance of the Draft PAC's direct mail house list. The Draft PAC's direct mail firm (Eberle) maintained and marketed a list of Draft PAC direct mail donors, *i.e.*, the Draft PAC's direct mail house list. Direct mail accounted for 63% of the donors to the Draft PAC. According to Eberle records, the total income received from renting out the Draft PAC's direct mail list from July 2017 to November 2022 was a total of $88,350.27. Stated differently, utilizing well over half

of the donor data from the Draft PAC, Eberle generated less than $100,000 in list rental income over the course of more than five years. This is a far cry from $40 million as cited by the Government as revenue from Jack's overall business operations. PSR ¶ 21. It is absurd to claim that Jack's income since 2017 is somehow attributable to his operation of the Draft PAC, let alone the two solicitations at issue in this case.

Nor did Jack take substantial funds from the Draft PAC. Jack acknowledges three wire transfers from the Draft PAC to his personal account in 2017 and 2018 and accepts responsibility for not properly reporting these transfers. PSR ¶ 131–32. The largest transfer ($50,000), completed in May 2018, corresponded to an amount Jack previously donated to the Draft PAC to ensure it could continue operations. PSR ¶ 131. By 2018, the Draft PAC had ceased operations. *Id.* The two smaller transfers in 2017 ($20,000 and $5,000) occurred on the same day that Jack and his wife received several other reimbursements from the Draft PAC, and these transfers were likely inadvertent. PSR ¶ 132. Nonetheless, Jack acknowledges his error related to those transfers, whether by inadvertently transferring the funds or failing to properly report legitimate transfers. *Id.* These unreported transfers were the product of sloppiness, not a scheme. Indeed, when factoring in the salary, list rental income, and broker costs that Jack could have reasonably charged the Draft PAC but chose to forgo, Jack plainly contributed far more in equivalent financial value than the sum of these transfers.

Jack acknowledges, and in no way minimizes, the impact of his offense on recipients of the two post-July 22, 2017, solicitations. But in assessing that impact, it bears noting that the Government sought victim impact statements from approximately 3,600 individuals who received the two solicitations, and yet only 25 individuals provided Victim Impact Statements (15 of which the Government submitted for inclusion with the PSR). We respectfully note that, for at least 12

of the authors of the 15 statements the Government submitted, while the individuals may have received one or both of the solicitations at issue, they did not donate any money by virtue of those solicitations.  Specifically, Draft PAC donation records indicate those 12 individuals donated in response to earlier solicitations that were sent out *before* the charged criminal scheme in this matter began.[11]  The same is true for the gentleman referenced in the Government's brief.  ECF No. 24 at 8.  Donation records indicate his $2,700 donation on August 10, 2017 was in response to a solicitation that pre-dated the charged conspiracy.  Lastly, the average donation amount for the post-July solicitations was $45.23.  First Seifert Decl. ¶ 62.  This is not a case in which individuals were defrauded of their life savings.

In sum, the Court should disregard the Government's attempt to puff up this case into more than it is.  The nature and circumstances of this offense reflect limited wrongdoing that involves a relatively small loss amount in an otherwise lawful and sincere attempt to operate a Draft PAC.

**B.     Jack's Personal History and Characteristics.**

For 51 years, Jack has lived a life of service to his country, commitment to his family, and success in business.  He has also silently suffered from significant, undiagnosed mental health challenges.  His involvement in the conduct at issue is an aberration in his otherwise positive history.  This factor weighs heavily in favor of a non-custodial, variant sentence.

Perhaps more importantly, this case has caused Jack to do the hard work to develop a deeper understanding of what was broken in his life that needed fixing.  He realizes, through the work he has done, that his complicated psychological profile has contributed significantly to the

---

[11] Eberle (the Draft PAC's direct mail firm) meticulously tracks the performance of its mailings.  The pre-addressed return envelopes included with solicitations contain a unique code that ties a donation to the specific mailing to which the donor responded.  A review of the Eberle donation records confirms at least 12 of the individuals (one statement is unnamed) and the gentlemen referenced in the Government's brief donated in response to pre-July 22 solicitations that are not part of the offense conduct in this case.

chaos and dysfunction of his life. While some attributes have helped power his career and eventual financial success, many have caused his personal and professional existence to be filled with turbulence. Jack's commitment to rehabilitation, especially to treating the mental dysfunction that contributed to poor choices, is yet one more tangible example of his acceptance of responsibility.

Even a brief term of incarceration would be exponentially more punitive for Jack than it would be for an individual who does not suffer from his diagnosed mental health conditions: complex post-traumatic stress disorder and Asperger's Syndrome. As summarized below and discussed at length in the expert reports, evaluations, and declarations appended as Exhibits C1 (Robin Zachary, Licensed Independent Clinical Social Worker), C2 (Dr. Lynda Geller, Clinical Psychologist), C3 (Janet M. Perdue, retired Federal Bureau of Prisons ("BOP") Associate Warden and Residential Reentry Manager), and C4 (Phillip S. Wise, retired Assistant Director, BOP), for a person with Jack's neurological, mental, and physical conditions, it is not hyperbole to assert that every minute of every hour of every day in custody will be extraordinarily, abnormally, difficult. The BOP is simply not equipped to care for and protect a person with these kinds of special needs.

### 1. A Traumatic, Turbulent Childhood.

Jack's disjointed and disturbing childhood, fraught with domestic violence, attempted murder, and neglect, has influenced him all of his adult life. Jack was born into a military family to a young couple. Mental illness pervaded his family from the start. Jack's older brother George, a toddler at Jack's birth, was autistic and later diagnosed as schizophrenic. George's rages often prevented Jack from inviting friends to his home. Jack's father suffered from manic episodes and periods of extreme violence, often directed toward Jack or his mother or brother. Jack's father was later diagnosed with bipolar disorder. PSR ¶ 174. As a young child, Jack remembers his father burning his body with a lit cigarette, and Jack often laid awake at night hearing his mother's

- 18 -

screams as his father beat her. The physical abuse culminated when Jack's father attempted to murder Jack's mother by throwing her off a local bridge. Jack's father served only one year in prison for the crime due to his extreme psychiatric problems and eventually landed in a group home for psychologically disturbed adults. All of this occurred before Jack turned eight years old.

Jack was left to be raised by his single mother, a struggling neonatal intensive care nurse who was also responsible for Jack's brother's special needs. PSR ¶¶ 175, 178. The family lived paycheck-to-paycheck, sometimes requiring government assistance, because Jack's father never paid child support. *Id.* During this time, Jack was also sexually abused by his maternal aunt, who showered with him until Jack was ten years old and exposed herself to him when he was a teenager. *Id.* at ¶ 177. She also beat Jack with a belt. *Id.*

Due to the unremitting trauma of his formative youth, Jack suffered in school. He was bullied and developed obsessive compulsive disorder as a means to try and organize his life. He had few friends. Instead, Jack turned to isolated activities, such as fantasy play, where he dissociated from his body and lived a different life. To this day, Jack suffers from disturbing nightmares, waking in a panic and questioning whether he is safe, even at fifty-one years old. As discussed more fully below, the trauma also resulted in several life-altering mental health illnesses. In this way, Jack's horrific childhood has haunted him all of his life.

When making sentencing decisions, the district courts of the Seventh Circuit consider a defendant's childhood trauma. *See United States v. Turnipseed*, 47 F.4th 608, 618 (7th Cir. 2022) ("The district court considered several mitigating factors, including [the defendant]'s childhood trauma."); *see also United States v. Saldana-Gonzalez*, 70 F.4th 981, 983 (7th Cir. 2023) (same). In the Court's discretion, childhood trauma such as Jack's is grounds for a downward sentencing variance if the trauma affected the defendant's eventual crimes. *Cf. United States v. Stinefast*, 724

- 19 -

F.3d 925, 932 (7th Cir. 2013) (recognizing defendant's severe childhood trauma but declining a downward sentencing variance because defendant did not link trauma to eventual crime).

In Jack's case, the severe emotional and physical abuse he suffered at a young age is directly linked to his disordered thinking, impulsive decision-making, and erratic focus that facilitated the conduct that forms the basis of his conviction. Robin Zachary, a Harvard Medical School instructor and Licensed Clinic Social Worker, describes Jack's childhood as resulting in "the development of a dysregulated, amorphous self, infused with constant, ambient fear." Ex. B1 at 14. Zachary explains that while traumatized children can grow up to appear as seemingly normal adults, periods of stress often revive the past childhood trauma. Such a time of stress activates Jack's "survival defenses" to "fight, freeze, feign, flee, submit, or attach." *Id.* As Zachary iterates, these impulses are "most operative at the time of perceived threat." *Id.*

The loss of financial security of his family, including eviction from their home in 2015, and his wife, Kay's, continuing physical and mental health decline provided exactly the stressors and threat needed for Jack's childhood trauma to resurface. In this destabilized environment, Jack's survival defense surfaced, leading him to likely make more impulsive and ill-conceived choices than a well-regulated adult would have. Zachary indicates that Jack's "singular commitment to its [Republican politics] survival may have blinded him to the larger consequences of his actions." *Id.* at 21. Thus, the Court should account for Jack's severe childhood trauma, and the effect it had on his later health and decision-making, when fashioning his sentence in this case.

### 2. *Formal Education and Military Service.*

Given Jack's chaotic and traumatic childhood, Jack sought order and regulation from a young age and was drawn to service organizations, especially those focused on the military. Jack's grandfathers both served in the military—one was a Prisoner of War in WWII, the other was the

- 20 -

oldest Green Beret ever killed in action. After spending time in Cub Scouts and Boy Scouts—and echoing the long tradition of military service in his family—Jack joined the Civil Air Patrol (U.S. Air Force Auxiliary) at age 14 and also served in the 111th Search & Rescue Squadron. These experiences were overwhelmingly positive for Jack. He loved the mission, rigor, and camaraderie of the Civil Air Patrol and found himself skipping school to take on extra shifts. Jack was quickly promoted from Cadet Airman Basic to Cadet Flight Officer, completed multiple missions, including locating downed aircraft, and was recognized with a number of awards.

Influenced by his grandfathers, Jack enlisted in the U.S. Army in 1991 at age eighteen. Soon after, he was violently assaulted by another soldier while in training but, at the urging of his superiors, did not report the resulting injuries to his face and jaw. Jack had completed nearly all of his training when old leg injuries and Overactive Bladder Syndrome prevented him from taking the Army's physical fitness test. Despite this, Jack still so impressed his superiors that he was promoted to Private First Class. In early 1992, Jack was Honorably Discharged, in part due to the injuries from his assault. He became depressed, feeling as though his young body had failed him.

Jack came home committed to attaining degrees in higher education. Before joining the Army, Jack had dropped out of high school in the tenth grade, attaining his GED the following year. But after his military service, Jack received Associate and Bachelor of Science Degrees in just two short years. At the encouragement of his Veterans Affairs counselor to become the first disabled veteran in North Carolina to receive VA Vocational Rehabilitation benefits for a graduate, professional, or advanced degree, Jack applied to and was accepted to the University of North Carolina School of Law, where he received his law degree in 1998. Thus, despite his traumatic childhood and rocky start to education, Jack showed his tenacity and understanding of the importance of education, which he has imbued in all three of his children.

### 3. A Lifelong Passion for Politics and Record of Government Service.

Since college, Jack has been involved in his lifelong passion—politics. During college, he worked as a paid staffer for his congressman's reelection campaign. After graduation, he served as lead plaintiff in a voting rights case that reached the United States Court of Appeals for the Fourth Circuit, after which he was recruited to run against an incumbent North Carolina State Representative in the 1994 primary election. While he lost the runoff election by only six votes, Jack stayed involved, shortly thereafter working on a successful U.S. Senate campaign. In 1996, he won the Republican nomination for State Auditor, taking a leave from law school to run in the general election. After working at the Republican National Committee and volunteering in connection with the 2000 presidential election, Jack worked at the U.S. Department of Labor and the U.S. Commission on Civil Rights. By the mid-2000s, Jack served as Counsel to the U.S. Senate Judiciary Committee, followed by jobs in the U.S. House of Representatives as Communications Director, General Counsel, and Chief of Staff to five different members of Congress. In 2015, Jack launched his digital marketing company, Reach Right, which helps fundraise for various nonprofit and political candidates and causes across the country. In short, his deep love and fascination of politics—developed in his youth, when he would spend hours talking to his grandmother about the Kennedys and watching C-SPAN and CNN—has directed Jack's career steps since he left the Army at age nineteen.

### 4. Significant Mental Health Challenges.

One overwhelmingly positive result of Jack's case is that it has caused him to seek professional mental health evaluation and treatment. Jack had for *decades* suffered from a number of psychiatric struggles—disordered thinking, obsessive behaviors, hypervigilance, and suicidal ideation, among others—but had never sought help. Over the course of working with Jack, the

undersigned can attest that he has wholly dedicated himself to working with a team of mental health experts and to plotting a healing path forward.

After a comprehensive evaluation process, Zachary concluded Jack suffers from a constellation of disorders: (i) complex post-traumatic stress disorder (PTSD); (ii) severe major depressive disorder; and (iii) generalized anxiety disorder. Ex. C1 at 4, 19, 20. Zachary explains that Jack's exposure to repeated traumatic events wrought neurobiological changes that impacted his ability to function:

> Complex post-traumatic stress disorder is notable for contributing to an entrenched dysregulation of the endocrine system resulting in frequent re-activation of primary trauma symptoms when the adult is presented with state dependent cues. An emotional system primed for threat, that veers between reactivity and dissociation, is often the legacy of early and sustained abuse, and provides diagnostic context for understanding the pattern of poor, precarious choices and instability that weaves through Jack's life.

*Id.* at 4. This analysis and these findings are important for two reasons. First, they provide important context for considering Jack's offense conduct. The pre-frontal lobe of Jack's brain has been "so damaged by the chronic stress" of his life that his observational skills were lessened and his ability to think linearly and clearly was distorted. *Id.* at 21. This is not to minimize Jack's conduct, but instead to provide a richer picture of the man who made the choices for which he is before the Court. Second, Zachary's evaluation and diagnosis show Jack's commitment to identifying what is not working in his life and fixing it moving forward. It is a tangible expression of Jack's remorse that he has undertaken to address his underlying mental health challenges.

In parallel, after an intensive battery of tests, Jack has been recently diagnosed with an ASD—a significant neurodevelopmental disorder. Ex. C2 at 1. Dr. Geller explains that Jack's ASD diagnosis helps understand how Jack's brain functions differently than someone without ASD, including disjointed thinking, hyperfocus, diffuse communication, and profound

disorganization. She observes that Jack's hyper focus was "so obsessive, perseverative, and all-consuming that he had many 'blind spots' along his path of life." Ex. C2 at 23. Dr. Geller highly recommends that Jack receive ASD-specific therapies in his areas of disability including organization and executive function and social disability—and, as with Zachary—Jack has committed to finding effective strategies to manage his issues and lead a productive life.

### 5. *Physical Health Difficulties and Prognoses.*

While Jack enjoys moderate health, he suffers from multiple chronic physical conditions that would be difficult to manage during incarceration. Several physical challenges stem from his time in the Army. First, in 1991, an incident at the firing range left Jack with significant tinnitus and hearing loss in his right ear. PSR ¶ 188. That same year, Jack was the victim of a vicious attack by another young Army private. The assailant fractured Jack's jaw, ripped the upper lip frenulum (the web of tissue connecting the lip), and left him concussed on the floor.[12] Finally, during Jack's time in the Army, he was diagnosed with Overactive Bladder Syndrome (OBS) after a surgical procedure by an Army doctor. PSR ¶ 188. This condition is one of Jack's most challenging to manage and causes him daily discomfort, the excessive need to void, and stress-induced urinary frequency. Jack manages this condition with Myrbetriq, but this medication (along with three others he needs to manage other physical conditions) would not be available in prison because they are not available through the BOP. *See* Decl. of Phillip Wise at ¶¶ 18–19, attached hereto as Exhibit C4 (hereinafter, "Wise Decl.").

After his Army service, Jack developed Irritable Bowel Syndrome as a result of an emergency appendectomy and subsequent removal of his ileocecal valve and portions of his small and large intestines. PSR ¶ 188. This condition is also difficult to manage and causes Jack extreme

---

[12] An MRI performed in August 2023 reveals that Jack's brain still shows signs of this trauma, including small lesions in his right anterior frontal lobe, though they do not impact his activities of daily living. PSR ¶ 189.

discomfort at regular intervals.

Jack's most recent surgery was also his most serious. On Super Bowl Sunday 2018, Jack suffered a severe heart attack in front of his children and Kay. He was rushed to the hospital where he underwent an angioplasty with stent placement in his right coronary artery and was subsequently diagnosed with cardiovascular arteriosclerosis disease and hypertension. *Id.* These illnesses have triggered multiple secondary conditions, including jaw pain, angina, and severe cold intolerance—all compounded by Jack's statin-induced polyneuropathy. *Id.*

As discussed further below, *infra* § C.3, the BOP almost certainly would be unable to manage these conditions appropriately, causing them to worsen. When combined with the complex web of trauma-induced mental health challenges from which Jack suffers, his physical health weighs in favor of a non-custodial sentence.

### 6. *Strong Ties to Family and Service to Others.*

Though justifiably proud of his military and governmental service, nothing means as much to Jack as his family. To say the Daly family is "close" is an understatement. Jack, his wife, Kay, and their three children—Patrick, Jack Reagan ("J.R."), and Reagan—are incredibly tight-knit.[13] Jack and Kay met in October 1995 while attending the election night party for the Mayor of Raleigh, North Carolina. Kay, who loves politics with the same vigor as Jack, had recently moved to Raleigh from Washington, D.C. at the behest of her employer, a freshman Republican congressman. They were engaged within two months and married within a year. Though the couple has weathered numerous painful, crushing, debilitating challenges, they are still best friends and will share with the Court that they have had many wonderful years together. Indeed, Jack and Kay will celebrate their 27th wedding anniversary on December 14, the day before the sentencing

---

[13] A selection of Daly family photographs is attached hereto as Exhibit D. Relatedly, letters submitted by Jack's family, friends, and colleagues regarding his character are attached hereto as Exhibit E.

hearing in this case.

Kay is incredibly and unwaveringly supportive of her husband, describing him as a "kind, generous, patient, brilliant, hardworking, empathetic" man who is a great father and an amazing husband. PSR ¶ 181. Throughout her life, Kay has herself suffered incredible trauma—including being raped as a college student and sexually assaulted by an employer—and has been in mental health treatment for several years. More significantly, Kay's immense physical challenges, multiple back surgeries, and prior opioid addiction, meant that, for long spans of time, Jack was essentially a single-father to the kids and single-breadwinner for the family. *See* PSR ¶¶ 179–82.

In addition to putting an incredible amount of responsibility and pressure on Jack as a parent, Kay's degenerative disc disease and attendant back surgeries also resulted in a period of extreme financial stress for the family. The medical claims for Kay's third back surgery were initially approved by the family's insurance carrier, but after the procedure, they were denied. PSR ¶ 182. This triggered $150,000 in unexpected, out-of-pocket medical expenses for the family and ultimately caused the family to file for bankruptcy. *Id.* Once Jack left his federal government service in 2015, he was determined to find a way to continue to pursue his passion for politics, as well as to find financial stability for his family. Jack started Reach Right Digital Marketing and achieved substantial financial success in digital marketing for a wide array of clients. PSR ¶ 202.

Jack was, and is, an extremely involved father. While Kay was bedridden much of the time when the children were younger, Jack took the children to school every day, fed them every night, attended the parent-teacher meetings and sports games and recitals, and took them to their doctor's appointments. Jack's family and friends speak with one voice in describing him as a devoted dad. Even when his children were older and Jack moved his residence to the Virgin Islands in 2019, he remained in constant communication with Kay and his children. But no matter how many diapers

- 26 -

he changed, miles he drove his kids to and from sports, or private educational opportunities were made possible by his work ethic, Jack regrets not spending more time with his kids. Nonetheless, all three of Jack's children have found success despite the chaos in which they were raised. Patrick is in his third year of undergraduate studies as Baylor University, J.R. in his second year at American University, and Reagan is excelling academically at boarding school and taking on advanced courses. Jack takes great pride in how he was able to raise normal, well-adjusted children amid the disorder of their parents' lives.

It is apparent, however, that all three still need his parenting, perhaps now more than ever. For example, in April 2023, Reagan was referred to her school's psychologist for exhibiting signs of suicide ideation and remains in therapy for depression and anxiety. Patrick, who has been recently diagnosed as having ASD, has struggled his entire life with socialization, bullying, and learning disabilities, thus requiring a full-time tutor to assist him with his schooling.

Jack's care for his family, as well as his military and government service, aptly demonstrate his devotion and commitment to others over himself. Further, Jack believes deeply in community service and giving back. An overarching theme of the character letters in support of Jack is his kindness and generosity. As his wife, Kay, describes, Jack is a "truly decent, kind man", Ex. E1 at 6, with a "kind heart [and] gentle manner," *id.* at 1. Other echo this sentiment. Rufus Edmisten, former Secretary of State and Attorney General for the State of North Carolina, relays that Jack "consistently demonstrated collegiality, inquisitiveness and kindness." Ex. E5. Col. Thomas Beckman, retired U.S. Marine Corps, similarly describes Jack as "kind" and states he is "principled, [] values service . . . and treats everyone with respect." Ex. E2 at 2. Lastly, Kaylan Schild, Jack's great-niece, notes "Jack's habitual altruism surpasses anyone else I've encountered. His generosity has touched many lives[.]" Ex. E11 at 1.

Through his company, Reach Right, Jack has used his unique skills to raise money for charitable and nonprofit organizations and causes, including animal welfare organization, charities that support disabled veterans and military personnel abroad, legal defense funds for law enforcement officers, Catholic and Jewish organizations, and Protestant ministries such as the Billy Graham Evangelistic Association and Prison Fellowship Ministries. PSR ¶ 202. In 2021, without charging the charity customary fees, Jack raised funds to provide medical supplies, food, and other necessities to war refugees in Ukraine. Moreover, in association with the economic development program in which Jack participates in the Virgin Islands, Jack has donated to numerous causes. By way of just two examples, Jack donated 24 one-year student scholarships at the University of the Virgin Islands (a historically Black university) and provided funds for the development of a local skate and bike park.

Taken together, Jack's history and characteristics as an individual weigh extremely heavily in favor of a non-custodial sentence.

### C. A Variant Sentence Serves the Section 3553(a) Factors.[14]

#### 1. *The Need to Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.*

The sentence imposed by the Court must adequately "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment" to Mr. Daly. 18 U.S.C. § 3553(a)(2)(A). Every federal crime is serious, and Jack acknowledges the seriousness of his offense. However, in analyzing the seriousness of Jack's offense, it is critical to note just how far afield this case is from standard fraud cases, let alone the types of political fundraising cases that

---

[14]  In addition to the factors outlined below, the court must also consider the need for Mr. Daly to provide restitution to the victims of his offense. The parties agree that Mr. Daly's restitution obligation is $69,978.37—the donations received by virtue of the two Draft PAC solicitations sent after July 21, 2017, joint and several with Pendley. As referenced in the PSR, on September 20, 2023, Mr. Daly himself fully satisfied this obligation by paying the full sum to the Clerk of this Court. PSR ¶ 223. There is no further need for Mr. Daly to provide restitution.

the Department generally exercises its discretion to pursue. This, combined with other collateral consequences inflicting punishment on Jack, make clear that a custodial sentence is not required to provide just punishment in this case.

To begin, this case is differently situated from quintessential fraud cases in that the information withheld from the solicitations (*i.e.*, that Clarke stated he would not run for Senate) was publicly available and the subject of local and national media coverage.[15] Again, that does not excuse sending out solicitations that provided an incomplete picture of Clarke's public statements regarding running. Instead, it distinguishes the culpability of the conduct here; unlike cases where the information withheld or misrepresented is not publicly available, potential donors had access to up-to-date information regarding Clarke's intention to run for Senate via several news sources.

Relatedly, this case is very far afield from the types of PAC cases that the Department has chosen to pursue criminally in the past. Indeed, those cases have often involved substantial monetary gain in the form of misappropriation of donations to personal accounts of the PAC organizers. *See, e.g.*, *United States v. Tunstall*, No. 21-CR-223 (W.D. Tex.) (three defendants engaged in a scheme to operate two fraudulent PACs purportedly affiliated with or in support of particular candidates for public office but instead transferred substantial funds—$2.3 million out of $3.5 million raised—to their personal and business bank accounts); *United States v. Bell*, No. 21-CR-284 (D.D.C.) (among other things, defendant simultaneously created and operated two PACs—one to purportedly support the re-election of former President Donald Trump and the other

---

[15] *See, e.g.*, Patrick Marley, *Milwaukee County Sheriff David Clarke Won't Run for Senate and Calls Group Trying to Draft Him a 'Scam PAC'*, MILWAUKEE JOURNAL SENTINEL (July 21, 2017), https://www.jsonline.com/story/news/ 2017/07/21/sheriff-david-clarke-wont-run-senate-against-tammy-baldwin/500561001/; *Milwaukee Sheriff Says He's Not Running for US Senate*, AP News (July 21, 2017), https://apnews.com/0028ad674ff34c889d839e048e7ba51c/ Milwaukee-sheriff-says-he's-not-running-for-US-Senate.

to support election of then-candidate Joseph Biden—and pocketed the $340,000 in donations to the two PACs); *United States v. Taub*, 19-CR-15 (D.R.I.) (former congressional candidate created fake PACs, failed to register with the FEC, committed identity theft, and converted over a $1 million in contributions for his personal use); *United States v. Prall*, 19-CR-13 (W.D. Tex) (defendant created websites soliciting donations to support Bernie Sanders, Donald Trump, among others, in the 2016 presidential election, but pocketed contributions for personal use, including through transfers to shell companies); *United States v. Tierney*, 18-CR-804 (S.D.N.Y) (defendant engaged in telemarketing scheme purporting to raise money for social causes such as law enforcement appreciation or autism awareness, but contributions were pocketed by defendant who was ordered to pay $1,175,417 in restitution to victims).

We are aware of only one case premised on using a PAC to increase the size of a house file. *See United States v. Rogers*, 19-CR-270 (E.D. Va.). However, *Rogers* is readily distinguishable. In that case, the PAC at issue purported to fund "support [for] get-out-the-vote and election integrity protection efforts" in support of a candidate for Governor of Virginia and a candidate for Attorney General of Virginia. *See* 19-CR-270 (E.D. Va.), ECF No. 4, at 4 (criminal information). However, the defendant never intended to (nor did the PAC actually) spend ***any*** money on get-out-the vote efforts, and instead used the money to pay preferred vendors for further prospecting to increase the size of the PAC's house file and to make payments directly to the defendant and his associates. *See* 19-CR-270 (E.D. Va.), ECF No. 8, at 6 (plea agreement). That is in stark contrast to this case. The efforts to draft Clarke began as unquestionably bona fide and, up to its last two solicitations, expenditures undertaken by the Draft PAC, including funding additional fundraising efforts, were consistent with the legitimate purpose of draft PACs. Even with respect to the last two solicitations, personal profit was not a motivation for sending them out.

Additionally, Jack has suffered fully the collateral consequences of his conviction, including loss of potential business and forever having to live with the stain of being a convicted felon. Perhaps most painful to Jack, who has dedicated essentially his entire life to politics, he will very likely no longer be able to exercise his right to vote. We respectfully submit these collateral consequences, in conjunction with the requested sentence, adequately and justly punish Jack for his offense without the need for a period of incarceration.

### 2. *The Need to Deter Future Criminal Conduct and Protect the Public from Further Crimes by Mr. Daly.*

The Court must consider both specific and general deterrence to future criminal conduct in fashioning an appropriate sentence. 18 U.S.C. § 3553(a)(2)(B). In assessing whether a prison term, as opposed to home confinement, is appropriate to protect the public and deter the defendant from future crimes, courts in this Circuit look to a defendant's prior record, any history of violence, and his likelihood of reoffending in the context of his current circumstances. *See United States v. Sholar*, 252 F. Supp. 3d 711, 714 (E.D. Wis. 2017).

Mr. Daly will not reoffend. He comes before the Court with a sterling record of service to the United States and not a single prior criminal conviction—a factor the Sentencing Commission has acknowledged indicates considerably lower recidivism rates than other offenders, including those with just one criminal history point.[16] Similarly, a sentence of 24 months probation will provide a deterrent effect to other would-be offenders, particularly when combined with the significant restitution obligation and the lengthy term of supervised release. This sentence— especially when considered with the serious consequences that result from a federal felony conviction, including negative publicity, loss of professional licenses, tarnish of reputation—will

---

[16] *See* U.S. SENTENCING COMM'N, *Recidivism of Federal Offenders Released in 2010*, September 2021, at 28, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf.

discourage similarly-situated individuals who work in politics.

### 3. The Need to Provide Care to Mr. Daly.

As outlined above, *supra* § B.3, Mr. Daly is of fair physical health but exceedingly poor mental health. This Court has the authority to consider Mr. Daly's physical and mental impairments when determining the sentence it believes appropriate under 18 U.S.C. § 3553(a). *United States v. Millet*, 510 F.3d 668, 680 (7th Cir. 2007), *as amended on denial of reh'g and reh'g en banc* (June 27, 2008); *see also United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009). Both weigh in favor of a non-custodial sentence.

The quality of healthcare in the BOP is broadly recognized as subpar and, at times, even dangerous.[17] Phillip S. Wise, former Assistant Director of the BOP, explains that that the BOP is tasked only with providing medically necessary care, not medically appropriate care, and that even this goal is thwarted by the BOP's long-standing difficulty recruiting and retaining qualified medical staff. Wise Decl. ¶¶ 11, 15. Mr. Wise explains that Mr. Daly will encounter multiple medical challenges should he be sentenced to a term of incarceration, chief among them limited access to medical specialists and the inability to remain on multiple medications that are part of Mr. Daly's closely managed medical regimen. *Id.* ¶¶ 7, 19. Because of this, Mr. Daly's chronic physical conditions—including Overactive Bladder Syndrome, Irritable Bowel Syndrome, cardiovascular arteriosclerosis, angina, cold hypersensitivity, and nerve damage—will be exceptionally challenging to manage in prison. This factor, when viewed in connection with the other statutory factors, counsels in favor of permitting him access to his team of specialists and medications through a term of probation. *See Sholar*, 252 F. Supp. 3d at 714 (considering, in concluding that a non-custodial sentence was appropriate, the defendant's worsening medical

---

[17] *See* Meg Anderson, *1 in 4 inmate deaths happens in the same federal prison. Why?*, NAT'L PUB. RADIO (Sep. 23, 2023), https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates.

conditions alongside his lack of violent criminal history and low risk of recidivism).

Moreover, Jack faces significant risk to his physical health if sentenced to a term of incarceration. Janet M. Perdue, a former Associate Warden and Residential Reentry Manager, among other positions held at the BOP over 34 years, concludes that "because of his diagnoses, and behavioral nuances attendant to those diagnoses, Mr. Daly will face significant challenges and abuses should a term of incarceration be imposed. As a result of his disorders and especially the behaviors associated with his ASD diagnosis, it is extremely likely [Jack] will serve a harsher and more punitive sentence than other offenders who are not autistic, which is only exacerbated by the other diagnoses." Decl. of Janet M. Perdue ¶ 11, attached hereto as Exhibit C3 (hereinafter, "Perdue Decl."). Perdue goes on to state that Jack "poses a high risk of being victimized physically, emotionally, and financially by stronger, more skilled, socially adept, and manipulative inmates." *Id.* ¶ 38. Jack "is at a significant disadvantage as compared to other 'neurotypical' inmates. [His symptoms and behavioral patterns] will make life in a prison environment extraordinarily difficult." Perdue Decl., Ex. C3 ¶ 53. "Some anxiety would be expected for most individuals in a correctional setting, but for Mr. Daly, who already suffers from certain emotional difficulties, anxieties and fears would likely be immeasurable." Perdue Decl., Ex. C3 ¶ 54.

### 4. *The Kinds of Sentences Available.*

As properly calculated in the PSR, Mr. Daly's advisory sentencing guidelines range is 6 to 12 months. He faces a statutory maximum of up to five years in prison, followed by three years of supervised release. Mr. Daly's advisory guidelines range falls within Zone B of the Sentencing Guidelines Manual, such that the minimum term may be satisfied by a sentence of probation that includes conditions that substitute intermittent confinement, community confinement, or home

- 33 -

detention for imprisonment.[18]  *See* U.S.S.G. § 5B1.1(a)(2); PSR ¶ 214.

Mr. Daly is a first-time offender who has not been convicted of a crime of violence or otherwise serious offense.  Pursuant to 28 U.S.C. § 994(j), Congress directed the Commission "to insure [sic] that the guidelines reflect the general appropriateness of imposing *a sentence other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  *Id.* (emphasis added).  The Commission has done so, recently making clear that individuals who receive an adjustment under U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders), and whose applicable guideline range is in Zone A or B of the Sentencing Table—***like Mr. Daly***—should generally receive "a sentence other than a sentence of imprisonment."  *See* § 5C1.1 cmt. n. 10(A) (Nov. 2023).

### 5.  *The Need to Avoid Unwarranted Sentencing Disparities.*

The Court must impose a sentence that avoids unwarranted sentencing disparities "among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Any term of imprisonment here would be disparate when compared both to individuals with a similar Offense Level and Criminal History Category, as well as those convicted of similar conduct.

Recently, the Federal Judicial Center in conjunction with the U.S. Sentencing Commission created a "Judicial Sentencing Information" platform (JSIN).[19]  The JSIN "provides five years of cumulative data for people who were convicted of a similar or the same crime, have a similar criminal history, and have been convicted of an offense that falls under the same sentencing

---

[18] Perdue's report details the impact on Mr. Daly of other confinement options that the Court may consider, including a sentence to a residential reentry center and home detention with location monitoring at Mr. Daly's expense.  *See* Perdue Decl., Ex. C3 at ¶¶ 50–51.

[19] U.S. Courts, *Judiciary Studies Use of Online Tool in Presentence Reports* (Apr. 28, 2023), https://www.uscourts.gov/news/2023/01/25/judiciary-studies-use-online-tool-presentence-reports.

guideline." *Id.* Dozens of district courts across the United States have begun routinely incorporating the results of JSIN runs into PSRs, including districts within the Seventh Circuit. *Id.*

According to the JSIN:

> During the last five fiscal years (FY2018-2022), there were 1366 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 10 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 substantial assistance departure. For the 432 defendants (32%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 6 month(s) and the median length of imprisonment imposed was 6 month(s). For all 1366 defendants in the cell, the average sentence imposed was 3 month(s) and the median sentence imposed was 2 month(s).[20]

However, these sentences include those individuals who, unlike Mr. Daly, have been assigned a criminal history point. Removing those defendants with a criminal history point, there remain 1,202 defendants with an Offense Level of 10 and Criminal History Category of I.

Mr. Daly provides the Court with the histogram on the following page to give a more informative perspective of these 1,202 sentences of similarly situated individuals in terms of how the sentences are distributed by select ranges.[21] As indicated, 48% (577) individuals received a sentence of a single day (0.03 months) or less; 2.2% received a sentence greater than a single day but not greater than one month; 2.0% received a sentence greater than one month but no greater than 2 months and so on. Only 11.4% received a sentence within the applicable advisory range of 6 to 12 months. Just 1.7% (21 individuals) received a sentence above the advisory range. Accordingly, while a sentence within the range would create unwarranted sentencing disparity, a probationary sentence would not.

---

[20] U.S. Sentencing Commission, Judiciary Sentencing INformation [sic] platform (JSIN), *available at* https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last accessed Dec. 8, 2023) (selecting Guideline 2B1.1, checking "Include Sentencing Length Data," and selecting the cell at Offense Level 10 in Criminal History Category I).

[21] Undersigned counsel engaged the services of SentencingStats.com, Inc. (www.sentencingstats.com) to analyze the U.S. Sentencing Commission's publicly available datafiles and create the histogram set forth below.



Moreover, the Commission now prefers that courts impose non-custodial sentences where, as here, the defendant qualifies for the Zero Point Offender adjustment, and the Total Offense Level falls within Zone B. As new application note 10(A) to USSG §5C1.1 states, "[i]f the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, *a sentence other than a sentence of imprisonment . . . is generally appropriate*." *Id.* (emphasis added). Thus, a non-custodial sentence in this case both is empirically supported and encouraged by the Commission.

Taken together, the Section 3553(a) factors counsel in favor of the sentence recommended here by Mr. Daly.

## CONCLUSION

For these reasons, Mr. Daly respectfully requests that this Court grant his motion for a downward variance and impose a sentence of 24 months' probation, three years of supervised release, restitution in an amount of $69,978, and forfeiture in an amount of $69,978.

- 36 -

Respectfully submitted,

/s/ *Matthew D. Krueger*

Matthew D. Krueger
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
Phone: (414) 297-4987
Email: mkrueger@foley.com

Jason H. Cowley
Roy G. Dixon, III
McGuireWoods LLP
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone: (704) 343-3000
Email: jcowley@mcguirewoods.com
          rdixon@mcguirewoods.com

- 37 -

## CERTIFICATE OF SERVICE

I hereby certify on this 8th day of December, 2023, a true and correct copy of the foregoing was filed electronically and is available for viewing and downloading from the Court's ECF System. Notice of this filing will be sent to all counsel of record by operation of the ECF System.

/s/ *Matthew D. Krueger*

**<u>Appendix A</u>**

**Index of Exhibits**

## Index of Exhibits

| Exhibit | Description |
|---|---|
| **A.** | **Fact Exhibits** |
| A1 | Email correspondence dated January 27, 2017 |
| A2 | Email correspondence dated February 19, 2017 |
| A3 | Email correspondence dated March 30, 2017 |
| A4 | Email correspondence dated March 3, 2017 |
| A5 | Email correspondence dated February 16, 2017 |
| A6 | Email correspondence dated March 6, 2017 |
| A7 | Email correspondence dated March 3, 2017 |
| A8 | Direct mail solicitation deployed by the Draft PAC on August 2, 2017 |
| A9 | Email correspondence dated September 1, 2017 |
| A10 | Email attachment to Exhibit A9 |
| A11 | Email correspondence dated September 2, 2017 |
| **B.** | **Subject Matter Expert Declarations** |
| B1 | Supplemental Declaration of Kevin Seifert |
| B2 | Declaration of Emily Hoover |
| **C.** | **Mental Health and Federal Bureau of Prison Expert Declarations** |
| C1 | Declaration of Robin Zachary, Licensed Independent Clinical Social Worker |
| C2 | Psychological Evaluation by Dr. Lynda Geller, Clinical Psychologist |
| C3 | Declaration of Janet M. Perdue, retired Federal Bureau of Prisons Associate Warden and Residential Reentry Manager |
| C4 | Declaration of Phillip S. Wise, retired Assistant Director, Federal Bureau of Prisons |
| **D.** | **Collection of Daly Family Photographs** |
| **E.** | **Character Letters in Support of Mr. Daly** |
| E1 | Kay Daly |
| E2 | Col. Thomas Beckman |
| E3 | Brittany Bland |
| E4 | Chris Carmouche |
| E5 | Rufus Edmiston |
| E6 | Rick and Nell Erhardt |
| E7 | John Gizzi |
| E8 | Elbert Guillory |
| E9 | Phill Provance |
| E10 | Marion Diane Ryon |
| E11 | Kaylan Schild |
| E12 | Carl Stephens |
| E13 | Steven Woolfe |

1